IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, ) | CR 09-01733-TUC-JMR(JCG) |
| Plaintiff, ) | |
| vs. ) | **REPORT AND RECOMMENDATION** |
| Alex Ibarra Torres, ) | |
| Defendant. ) | |

Pending before the Court is a Motion to Suppress filed by Defendant Alex Ibarra Torres on October 9, 2009. (Doc. No. 17.) The government filed a Response to the Motion on October 20, 2009. (Doc. No. 19.) Defendant did not reply. This matter came before the Court for a hearing and a report and recommendation as a result of a referral made on August 21, 2009, pursuant to LRCrim 5.1.

Defendant's Motion was set for evidentiary hearing and evidence was heard on January 5, 2010 and January 8, 2010. Defendant was present and represented by counsel. This matter was submitted following oral argument at the conclusion of the hearing and taken under advisement. Defendant's Motion to Suppress seeks suppression of Defendant's statements on the grounds that the statements were in violation of Defendant's *Miranda* rights and were not voluntary. Having now considered the matter, the Magistrate Judge recommends that the District Court, after its independent review, DENY Defendant's Motion to Suppress.

## FACTUAL FINDINGS

On March 9, 2009, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") agents received information that the co-defendant in this case, John Geoffrey Ibarra ("Ibarra"), had purchased several handguns in multiple sales transactions involving more than one handgun at a time. ATF agents made inquiries of Federal Firearms Licensees throughout the Tucson and Phoenix areas and discovered that between August 9, 2008 and March 12, 2009, Ibarra had purchased a total of 25 handguns. For each transaction, Ibarra completed the required paperwork, Form 4473, and represented on that Form that he was purchasing the firearms for himself and not on behalf of another.

On April 28, 2009, ATF agents interviewed Ibarra, who admitted to buying the handguns for his cousin, Defendant Alex Ibarra Torres ("Torres"). Ibarra stated that Torres was prohibited from purchasing firearms, and so paid Ibarra $100 per gun. According to Ibarra, he would pick up money from Torres and receive instructions regarding what type of firearms to purchase, then purchase the firearms and take them directly to Torres. Ibarra admitted to purchasing between 22 and 32 handguns on Torres' behalf.

Ibarra was interviewed by agents again on April 30, 2009 at the ATF office. During that interview, he made statements consistent with the statements he provided to agents during the April 28, 2009 interview. Ibarra also told the agents that following his April 28, 2009 interview, he contacted Torres and told him he had been interviewed by ATF agents. According to Ibarra, Torres instructed him to tell the agents he had sold the firearms, and to "just keep talking to the ATF agents and see what happens."

After interviewing Ibarra on April 30, 2009, ATF agents Thomas Nevin and Shawn Murray visited Torres[1] at his place of employment, Catalina Auto Recycling. The agents entered the business and identified themselves as federal ATF agents to the employee working behind the

---

[1] Torres completed eleven years of schooling, finishing at Catalina High School in Tucson, Arizona. He has been married for 8 ½ years and has three children. He indicated that he does not read or write well, although he can read and write; Spanish is his first language. He has worked at Catalina Recyling for two years.

- 2 -

counter. The employee summoned Torres by radio. When Torres responded to the counter, the agents did not identify themselves to Torres as federal agents. Agents Nevin and Murray said they needed to talk to Torres and ask a few questions. He responded that he would talk to them. Torres testified that he agreed to talk to the agents because he wanted to hear what the agents would say. One of the agents asked if they could find a room to speak privately. Torres and the agents went to a nearby office, but Torres' boss, who was working there, told Torres that they needed to meet in another location. Either the boss or Torres led the way to a kitchen located through a door behind the front counter. Torres' boss left without entering the room.

The kitchen, which was used for a break room, was a small room, approximately 10 feet by 15 feet, and contained a table and two chairs on the left side of the room and cabinets, sink and refrigerator on the right. Torres entered the kitchen first, followed by Agent Nevin, then Agent Murray. Torres sat at the table in the chair that was closest to the door; Agent Nevin sat at the table in the only other chair, which was farthest from the entrance. Agent Murray went to the opposite side of the room and leaned against the counter; he was farthest from Torres.

The door to the room was closed once all three had entered the room. According to the agents, the door to the kitchen remained closed so as to provide privacy; the area adjacent to the kitchen was a front desk area in which a number of employees and/or other individuals were present. There was a dispute as to whether the door was locked. Torres testified that Agent Murray locked the door and said he was locking the door "for safety reasons." Torres claimed that Agent Murray turned the twist lock on the door knob after entering and that Torres heard it click. Although Agent Murray could not remember whether he closed the door or if the employee who led them to the kitchen closed the door, he was sure that the door was not locked because the door was not shut all the way (ie. not latched). Agent Nevin had no recollection of the door being locked. Regardless of whether the door was locked, Torres acknowledged that he was the closest to the door, he could have left the kitchen, and he did not ask or attempt to leave during the meeting. He also admitted that he did not want to leave. Although it was a small room, Torres testified that it did not "feel tight in there" - even with three people.

Once inside the room, the agents identified themselves as federal agents and showed their credentials. The agents told Torres that they were conducting a firearms investigation into the purchase of Beretta pistols. Agent Murray asked Torres if he would be willing to talk to him and Torres responded yes. Torres stated he didn't know why they would want to talk to him since he did not own firearms. Agent Murray told Torres that they had been in contact with Ibarra.[2] Torres then started telling the agents how he had Ibarra buy pistols for him to sell to Manuel. Torres made statements corroborating everything Ibarra had told the agents. Torres asked if anyone had been hurt by the guns. Agents told him no.

There was a dispute as to whether agents suggested that Torres would not be prosecuted. Torres testified that early in the interview, after he had talked about the guns, he asked whether he needed a lawyer and that an agent responded that did not, because he was not facing criminal charges.[3] Torres stated he felt more comfortable after receiving this response and that's when he started to answer the agents' questions. The agents testified that no promises were made to Torres as to whether he would be prosecuted. Agent Murray told Torres that the case would be referred to the U.S. Attorney's office, but agents did not know what would happen after that. Near the end of the interview, Agent Murray may have also told Torres that it would seem that a person might not want to be the sole focus of an investigation or a prosecution, so if he could provide information about Manuel, and maybe even beyond Manuel, it would seem to be helpful, but that it would ultimately be up to the U.S. Attorney. Torres stated he didn't know whether he'd be able to provide any additional information about Manuel. He told the agents he would look into it.

---

[2] According to Torres, it was at this point in the interview that the agents told him they had already spoke to his cousin. Agent Murray could not remember precisely when the agents first mentioned Ibarra. However, Torres' testimony regarding the timing of the reference to Ibarra is consistent with testimony given by Agent Nevins that Torres appeared to be bewildered at first and said he did not know why ATF wanted to speak with him, but a few minutes later volunteered that he bought pistols and sold them to Manuel. It is also consistent with Agent Murray's testimony that, although he was not sure when Ibarra's name first came up, he knew that his name came up at several points during the interview.

[3] Torres could not remember which agent make this remark.

- 4 -

At the interview, Agents Nevin and Murray wore plain clothes (jeans and shirts) and carried weapons concealed under their clothes. Torres could not see any weapons during the interview and the weapons were never discussed; however, Torres believed that the agents were armed because he could see a bulge on the right side of each agent's waistline.[4]

During the interview, the agents did not restrict Torres' movements. Torres was not placed under arrest. The agents and Torres testified that the tone of the conversation was low-key and cordial. No one was confrontational. No one raised his voice. Torres spoke freely to the agents throughout the interview and never expressed any hesitancy or desire to terminate the interview. At points he volunteered information. At the hearing, when asked whether he had wanted to get up and walk out of the interview, Torres responded that he was trying to find out what was really going on. Notably when Torres testified about the interview, he referred to the agents by their first names; he stated he was more comfortable calling them by their first names. At the conclusion of the interview, the agents asked Torres if they could contact him again in the future should they have any more questions, and Torres agreed. All witnesses testified that the interview lasted approximately 30 minutes and that Torres was not read *Miranda* warnings.

On Thursday, May 14, 2009, Agents Nevin and Murray went to Torres' house before 7:30 a.m. intending to ask him whether he had received any additional communication or information from Manuel; they learned that Torres had already left for work. The agents then called Torres on his cell phone and told him that they needed to talk to him either at his office or at the ATF office. Torres agreed to speak with agents at his office. The May 14, 2009 interview took place in the parking lot across the street from Torres' workplace. Torres was not placed under arrest, his movements were not restricted, no threats or promises were made, and the agents' firearms were concealed from view at all times. The agents described Torres' behavior during the interview as cooperative and responsive and stated that Torres volunteered information to the agents. The May 14, 2009 interview was recorded and a copy of the audiofile was played during the hearing. The

---

[4] Notably, Agent Murray testified that he conceals his weapon in the front of his pants, not at either side.

- 5 -

taped interview demonstrated a cordial, non-confrontational discussion. Torres did not sound as if he was under any stress or compulsion. In fact, Torres placed a phone call to his wife during the interview to get some phone numbers and received a phone call. During the interview, Agent Murray is heard to say, "like I told you before, we are not here to arrest you"; "we have no intention of arresting you right now. We are just looking for some information to find this Manuel guy." Agent Murray also told Torres that what the agents do is that they are factfinders, they gather information, prepare a report, and present the report to the prosecutor, the U.S. Attorney, who reads the reports and decides what to do as far as prosecution. Agent Murray reviewed Ibarra's statements as to the number of guns he had bought and when he bought them and Torres generally agreed with the accuracy of those statements. Murray told him he thought Torres had probably done something wrong, but he wasn't the prosecutor. Agent Murray also told Torres he would not refer the reports right away to the prosecutor to see if any thing develops with Manuel. Torres agreed to contact the agents if he thought of or learned any additional information regarding Manuel. The entire interview lasted approximately ten minutes.

Although Torres initially challenged the admissibility of the statements he made at both the April 30, 2009, and May 14, 2009 interview, Defendant conceded at the suppression hearing, that he was not in custody for *Miranda* purposes on May 14, 2009, and that his statements to agents on that date were voluntary. The Magistrate has nonetheless included a description of the May 14, 2009 interview because it gives context to and corroborates statements made in the earlier interview. In fact, the Magistrate notes that all participants testified that the second interview was very similar to the first.

On August 12, 2009, Torres and Ibarra were indicted on 21 counts of making a false statement during the purchase of a firearm in violation of 18 U.S.C. §§ 924(a)(1)(A) and 2(a), and one count of engaging in the business of dealing firearms without a license in violation of 18 U.S.C. §§ 922(a)(1)(A) and 924(a)(1)(D).

## ANALYSIS

Defendant challenges the admissibility of his inculpatory statements to the ATF agents on April 30, 2009, on two grounds. First, Defendant contends that agents failed to give him his *Miranda* warning. Second, Defendant contends that his statements were not made voluntarily.

**1. *Miranda* warning required only for custodial interrogation**

*Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny govern the admissibility of statements made during custodial interrogation in both state and federal proceedings. Statements made while a defendant is in "custody or otherwise deprived of [his] freedom of action in any significant way" which are not preceded by *Miranda* warnings are inadmissible in evidence. *Id.* at 444. A defendant is considered to be "in custody" for purposes of *Miranda* if a reasonable person would believe that he or she was not free to leave. *See United States v. Kim*, 292 F.3d 969, 973-74 (9th Cir. 2002) (citing *United States v. Beraun-Panez*, 812 F.2d 578, 580 (9th Cir. 1987)). The following five factors are among those likely to be relevant to deciding that question: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *Id.* at 974 (citations omitted).

Applying these five factors, the Magistrate concludes that Torres was not in custody on April 30, 2009; a reasonable person in Torres' place would not conclude that he was required to stay and be interviewed. First, as to the language used to summons Torres, agents told Torres they wanted to talk to him.[5] Torres agreed to talk to the agents. He admitted that he wanted to talk to the agents to find out what they knew. He led the agents to an office and when the office was not available, accompanied the agents to the break room. As noted by the Ninth Circuit, where the Court has found

---

[5] There was some conflict in the testimony as to whether the agents stated they "needed" to talk to Torres or were requiring him to talk to them. Torres testified that the agents said: "They need to make some questions." The Magistrate does not view the distinction as material given the context and setting. It was clear from all testimony that the agents wanted to ask Torres' questions and were not requiring Torres or insinuating that Torres was required to speak with them and Torres wanted to hear what the agents had to say.

- 7 -

an interrogation non-custodial, it has emphasized that the defendant agreed to accompany officers. *United States v. Bassignani*, 575 F.3d 879, 884 (9th Cir. 2009).

The second factor - the extent to which the defendant is confronted with evidence of guilt - is more likely found where the interrogator adopts an aggressive, coercive, and deceptive tone and less likely found where agents did not attempt to challenge a defendant's statements and merely asked him about the allegations. *Id.* Although Torres was told that the agents had spoke to Ibarra, it is undisputed that the agents' tone was conversational and nonconfrontational. The audiofile of the second interview, Torres' reference to the agents by first name during the interview as well as at the hearing, Torres' answering of his cell phone during the second interview, as well as the fact that Torres agreed after both the first and second interviews that the agents could contact him again in the future, supports the conclusion that the agents were not coercive.

The third factor - the physical surroundings of the interrogation - also weighs in favor of the government. Torres' was in familiar surroundings in the break room at his place of employment. *See Craighead*, 539 F.3d at 1083 (citing *Orozco v. Texas*, 394 U.S. 324, 326 (1969)) (the element of compulsion that concerned the Court in *Miranda* is less likely to be present where the suspect is in familiar surroundings). Although a police interview at a workplace may be custodial interrogation in some instances, *see United States v. Kim*, 292 F.3d 969 (9th Cir. 2002) (where defendant was surrounded by officers who locked defendant's husband out of their store, restricted defendant's communication with her son, directed defendant as to what language she should speak and when and where she could sit, and interrogated defendant for 50 minutes, workplace interrogation was custodial), the facts present here suggest that the workplace interview was not custodial. Torres agreed to talk to the agents at his workplace and helped to find a specific location for the interview; he was expecting the agents; he chose where to sit in the break room and testified that the room was not uncomfortable; he wanted to find out what the agents knew; and he admitted that he could leave the kitchen at any time, but did not want to do so. *See United States v. Bassignani*, 575 F.3d 879, 885 (2009) (finding that an interview at a conference room within defendant's workplace was a

familiar environment where officers did not prevent anyone from coming or going during the interview).

The fourth factor - the duration of the interview - weighs in favor of the government. The interview was relatively short - approximately 30 minutes in length. The Ninth Circuit has found that a defendant is not in custody when he was interrogated for more than one hour and where the interrogation lasted approximately 45 minutes. *See Bassignani*, 575 F.3d at 886 (citations omitted).

The degree of pressure used to detain the defendant - the fifth factor - also weighs in favor of the government; the Magistrate concludes that no pressure was used to detain Torres. Although agents did not expressly tell Torres that he could leave, Torres admitted that he could have left at any time, but wanted to stay and hear what the agents had to say. The Magistrate finds not credible Torres' testimony that an agent told him he did not need a lawyer, because he was not facing criminal charges, and the implication that Torres would not have spoken to the agents absent this statement. Torres' testimony is inconsistent with the audiofile of the second interview, in which Agent Murray explains that it is the prosecutor who will make charging decisions. Torres' testimony is also inconsistent with his subsequent testimony that the agents began to ask him questions after referring to his cousin. It was clear throughout his testimony that Torres was a willing participant in the interview and was being cagey in trying to find out to what extent he had been implicated; Torres as much as admitted the same.

In his Motion to Suppress, Defendant contends that his case in analogous to *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 1988), in which the Ninth Circuit concluded that the defendant was interrogated while in custody and therefore should have been given his *Miranda* warning. However, *Craighead* differs from this case in several key ways. First, the defendant in *Craighead* was interrogated in his home, and the court gave great weight to the fact that a defendant interrogated at home may not feel that they are free to leave because they have no safer place to go. *Id.* at 1082-83. Second, the defendant's home was "police-dominated" by the presence of eight law enforcement officers, representing three different law enforcement agencies, who were accompanied by two non-agents, one of whom was defendant's Air Force superior. *Id.* at 1085. All of the law enforcement

personnel were armed, some wore protective gear, and some of them unholstered their firearms in the defendant's presence. Third, the defendant was interviewed in a back storage room; the door to the storage room was closed and an armed officer wearing a raid vest leaned against it. *Id.* at 1086.

Defendant also relies on *Beraun-Panez*, 812 F.3d at 580, in support of his contention that officers placed psychological restraints on him such that he was in custody. That case is also factually distinct from this case: the defendant in *Beraun-Panez* was repeatedly accused of lying, confronted with false or misleading witness statements, interviewed by agents employing good guy/bad guy tactics, threatened with his alien status, separated from co-workers in a remote rural location, and told he would be interviewed until he told the "truth." *Id.*

**2. Defendant's statements were voluntary.**

The government has the burden to prove that a statement was voluntary by a preponderance of the evidence. *See United States v. Bautista*, 362 F.3d 584, 589 (9th Cir. 2004). "In evaluating voluntariness, the test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *Bautista*, 362 F.3d at 589 (internal citation omitted). In considering the totality of the circumstances, factors to consider include the presence of any police coercion, the length of the interrogation, its location and its continuity, whether the police advised the suspect of her rights, and whether there were any direct or implied promises of a benefit. *Clark v. Murphy*, 331 F.3d 1062, 1072 (9th Cir.2003). "In short the true test of admissibility is that the confession is made freely, voluntarily, and without compulsion or inducement of any sort." *Haynes v. State of Washington*, 373 U.S. 503, 513-14 (1963). A promise only vitiates consent if it is "sufficiently compelling to overbear the suspect's will in light of all attendant circumstances." *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir.1988). A statement by officers that a defendant may help himself by speaking with law enforcement does not render a defendant's subsequent statements involuntary. *See United States v. Okafor*, 285 F.3d 842, 847 (9th Cir. 2002). "Common sense may indicate that a suspect's recognition of the potential consequences of his or her crime may create incentives for cooperation. But there is nothing wrong with that." *Id.*

For all the reasons discussed in Section 1 above, particularly Torres' own testimony that he willingly participated in the interview with agents to find out what they knew, the lack of police coercion and improper inducement during the short interview, and the fact that questioning took place in an area familiar arguably chosen by Torres in which he felt he could leave, the Magistrate concludes that Torres' statements were voluntary.

In view of the foregoing, it is recommended that, after its independent review of the record, the District Court: DENY Defendant's Motion to Suppress. (Doc. No. 17.)

The parties have ten (10) days to serve and file written objections to the Report and Recommendation. The parties are advised that any objections should be filed with the following caption: **CR 09-1733-TUC-JMR**.

DATED this 4th day of February, 2010.

Jennifer C. Guerin
United States Magistrate Judge